UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────┐
│ PETER ALLEN,                             │
│                                          │
│                       Plaintiff,         │
│                                          │
│ -against-                                │
│                                          │
│ SUSAN MUELLER, et al.,                   │
│                                          │
│                       Defendants.        │
└─────────────────────────────────────────┘
```

No. 23-CV-5651 (LAP)

MEMORANDUM AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are the motions for summary judgment filed by Defendants Dr. Susan Mueller and Dr. David Dinello (the "State Represented Defendants" or "SRDs"),[1] (see dkt. no. 26)[2] and by Dr. Ann Andola and Dr. Mikhail Gusman (the "Non-State Represented

---

[1] Carl Koenigsmann was initially named as a defendant in the above-captioned case and joined the State Represented Defendants in their motion for summary judgment. However, the parties stipulated to Mr. Koenigsmann's dismissal from this case with prejudice on January 18, 2024, which stipulation the Court so-ordered four days later. (See dkt. nos. 53, 54.)

[2] In support of their motion for summary judgment, the SRDs filed a Memorandum of Law in Support of Their Motion for Summary Judgment, (see dkt. no. 27 [the "SRD Br."]), the Declaration of Carl J. Koenigsmann, (see dkt. no. 28), the Declaration of David Dinello, (see dkt. no. 29 [the "Dinello Decl."]), the Declaration of Susan Mueller, (see dkt. no. 30 [the "Mueller Decl."]), the Declaration of Rachel Seguin, (see dkt. no. 31), the Declaration of Michael J. Keane, (see dkt. no. 32 [the "Keane Decl."]), and exhibits attached thereto, and the SRDs' Rule 56.1 Statement, (see dkt. no. 33 [the "SRD 56.1 Stmt."]). The SRDs also filed a Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment, (see dkt. no. 65 [the "SRD Reply"]), a Counter Statement to Plaintiff's 56.1 Statement, (see dkt. no. 63), and the Reply Affidavit of Michael J. Keane and exhibits attached thereto, (see dkt. no. 64).

Defendants" or "NSRDs"), (see dkt. no. 26).[3]  Plaintiff opposes the motions filed by both the State Represented Defendants and the Non-State Represented Defendants, (see dkt. no. 59 ["Pl. Opp."]).[4]

For the reasons set forth below, the State Represented Defendants' motion is GRANTED in part and DENIED in part, and the Non-State Represented Defendants' motion is DENIED in its entirety.

## I.   **Background**

### A. **Factual Background**

#### 1.   The Parties

Plaintiff Peter Allen is an inmate who is currently housed at Eastern Correctional Facility ("Eastern"), a prison facility under the supervision and control of the New York State Department of

---

[3] In support of their motion for summary judgment, the NSRDs filed their Amended Memorandum of Law in Support of Their Motion for Summary Judgment, (see dkt. no. 35 [the "NRSD Br."]), the NRSDs' Rule 56.1 Statement, (see dkt. no. 18 [the "NSRD 56.1 Stmt."]), the Declaration of Ryan E. Manley and exhibits attached thereto, (see dkt. no. 19 [the "Manley Decl."]), the Declaration of Ann E. Loricchio Andola and exhibits attached thereto, (see dkt. no. 20 [the "Andola Decl."]).  The NSRDs have also filed a Reply Memorandum of Law in Support of Their Motion for Summary Judgment, (see dkt. no. 62 [the "NSRD Reply"]), and Counter Statement to Plaintiff's Rule 56.1 Statement, (see dkt. no. 61.)

[4] In further support of his opposition, Plaintiff filed the Declaration of A.J. Agnew and exhibits attached thereto, (see dkt. no. 43 [the "Agnew Decl."]), the Declaration of Kathryn Haas and exhibits attached thereto, (see dkt. no. 44 [the "Haas Decl."]), and a Statement Pursuant to Local Rule 56.1, (see dkt. no. 40 ["Pl. 56.1 Stmt."]).  Plaintiff has also filed a Response to Defendants' Amended Statements of Undisputed Facts, (see dkt. no. 70).

Corrections and Community Supervision ("DOCCS").  (See SRD 56.1 Stmt. ¶ 1.)  Plaintiff suffers from numerous chronic pains, including neck and joint pain, neuropathy, arthritis in his left knee, lumbar levoscoliosis, and degenerative disc disease throughout his cervical, thoracic, and lumbar spine.  (See id. ¶ 11; Pl. 56.1 Stmt. at 9-10; Andola Decl. ¶ 12.)  He has also been diagnosed with moderate degenerative cervical spondylosis and COPD/Emphysema.  (See Andola Decl. ¶ 12.)

Non-State Represented Defendant Ann Andola ("Dr. Andola") worked as a clinical physician at Eastern from 2009 to 2021 and again since February 2023.  (See id. ¶ 2.) She was Plaintiff's primary care physician from approximately October 2014 through September 2021, and has been his primary care physician since February 2023.  (See id. ¶ 12.)  Non-State Represented Defendant Mikhail Gusman ("Dr. Gusman") is a physician at DOCCS who periodically treated Plaintiff.  (See NSRD 56.1 Stmt. ¶ 24; Complaint, dkt. no. 1 ["Compl."] ¶ 17.)

State Represented Defendants Susan Mueller ("Dr. Mueller") and David Dinello ("Dr. Dinello") were Regional Medical Directors ("RMD") at DOCCS at all times relevant to the instant motions. (See SRD 56.1 Stmt. ¶¶ 3-4.)  Dr. Mueller remains an RMD at DOCCS, whereas Dr. Dinello left his position in 2021.  (See id.)

3

2.  <u>Plaintiff's Medical and Treatment History</u>

Before January 2017, Plaintiff had been prescribed Neurontin,[5] Elavil,[6] and Ultram[7] to treat his pain.  (<u>See</u> Andola Decl. ¶ 13; <u>see also</u> <u>id.</u> Ex. A at 1-2.)  Dr. Mueller asserts that in addition to those three pain medications, Plaintiff's pain has been treated with Tylenol, Ibuprofen, Meloxican, Piroxicam, a TENS unit, a left knee brace, a soft cervical collar, and back brace.  (<u>See</u> Mueller Decl. ¶ 24.)  Dr. Mueller also asserts that medical professionals at DOCCS had separately recommended Lamictal, non-steroidal anti-inflammatory agents, topicals, Lidoderm patches, Cymbalta, Celexa, Depakote, Tegretol, and other tricyclics to treat Plaintiff's pain.  (<u>See</u> <u>id.</u>)

In February 2017, Dr. Andola examined Plaintiff after he reported sciatic pain in his sleep.  (<u>See</u> Andola Decl. ¶ 15.)  Upon her examination, Dr. Andola increased the dosage of Plaintiff's Neurontin prescription to 900 mg twice per day and authorized additional accommodations such as gel insoles, a knee brace, a

---

[5] Neurontin is the brand name for gabapentin, a medication used to treat neuropathic pain.  Any references herein to gabapentin shall be used to refer interchangeably to Neurontin.  (<u>See</u> Andola Decl. ¶ 13 n.2.)

[6] Elavil is the brand name for amitriptyline, a tricyclic antidepressant used to treat depression that may also be prescribed to relieve neuropathic pain.  (<u>See</u> Andola Decl. ¶¶ 13 n.3, 25 n.5.)

[7] Ultram is the brand name for Tramadol, an opioid analgesic prescribed to relieve pain.  (<u>See</u> Andola Decl. ¶ 13 n.1.)

cane, a TENS unit, an extra blanket, and an extra pillow.  (See id.)  On May 4, 2017, after Plaintiff informed Dr. Andola that the pain in his back had worsened and requested a higher dosage of Neurontin, Dr. Andola increased his Neurontin dosage to 1200 mg twice per day.  (See id. ¶ 16.)

Plaintiff also has a history of substance abuse and depression.  (See SRD 56.1 Stmt. ¶ 12; see also Andola Decl. ¶ 12.)  In 2011, security officials at the facility at which Plaintiff was serving his sentence at that time accused Plaintiff of diverting his Ultram and Neurontin.  (See Expert Report of Dr. Adam Carinci, dated March 5, 2022, Allen v. Koenigsmann, 19-cv-8173 ["Allen I"], dkt. no. 348-16, at 1).  In addition, Dr. Mueller asserts that Plaintiff has a history of cocaine and heroin use and received two "Tier 3 Drug Use tickets at Eastern" in 2017.  (See Mueller Decl. ¶ 46).  Plaintiff disputes each of those assertions.  (See Pl. 56.1 Stmt. at 10-11, 31.)  However, on January 17, 2017, Plaintiff's urine sample returned a positive test for Buprenorphine, a substance that was known within DOCCS as a drug of abuse at the time.  (See Andola Decl. ¶ 14; see also id. Ex. A at 3.)

### 3.  The MWAP Policy

On June 1, 2017, DOCCS adopted the Medications With Abuse Potential ("MWAP") Policy.  (See SRD 56.1 Stmt. ¶ 5; Keane Decl. Ex. A.)  The MWAP Policy was authorized by Carl Koenigsmann, then

the Chief Medical Officer of DOCCS.  (See SRD 56.1 Stmt. ¶ 2; Keane Decl. Ex. A.)  The MWAP Policy required any DOCCS medical provider who sought to prescribe certain medications to submit an "MWAP Request" to the DOCCS RMD in charge of the medical provider's facility.  (See SRD 56.1 Stmt. ¶ 7.)  Before the DOCCS medical provider had authority to prescribe the requested medication for long-term use for chronic conditions, the RMD would have to approve the MWAP Request.  (See id.)

The stated purpose of the MWAP Policy was to control the prescriptions of medications that DOCCS believed might carry the risk of abuse or dependence by DOCCS inmates.  (See NSRD 56.1 Stmt. ¶ 5.)  Medications that required RMD approval under the MWAP Policy included Neurontin, Lyrica,[8] Baclofen, Flexeril, Ultram, Percocet, and Oxycodone.  (See SRD 56.1 Stmt. ¶ 8.)  Treating physicians at DOCCS facilities could face discipline for failing to adhere to the MWAP Policy.  (See NSRD 56.1 Stmt. ¶ 9.)

### 4.  The June 9, 2017, MWAP Request for Neurontin

On June 9, 2017, Dr. Andola submitted an MWAP Request to Dr. Mueller, in which she sought approval to prescribe Plaintiff a one-month bid of 1200 mg of Neurontin—i.e., to continue his then-current dosage—with eleven refills to treat Plaintiff's chronic

---

[8] Lyrica is the brand name for Pregablin, a medication used to treat nerve pain.  (See Andola Decl. ¶ 30 n. 8.)

pain.  (See SRD 56.1 Stmt. ¶ 15; Keane Decl. Exs. C and D.)  In
her MWAP Request, Dr. Andola noted that Plaintiff had seen a
neurosurgeon in September 2015 and undergone radiologic testing in
January 2016.  (See Keane Decl. Ex. D.)  On June 13, 2017,
Dr. Mueller responded, saying she needed "EMG findings with [the]
date," which were "far more important than radiologic findings"
Dr. Andola had included in her MWAP Request.  (Keane Decl. Ex. E.)
Dr. Andola responded later that day, summarizing the findings of
an EMG[9] taken on August 7, 2015, but noting that the actual results
of the EMG were no longer in Plaintiff's chart—only the summary
she had provided Dr. Mueller.  (See Keane Decl. Ex. G.).  In that
same email, Dr. Andola copied DOCCS doctors Dinello, Gusman, and
John Hammer.  (See id.)

Dr. Dinello responded on June 14, 2017, noting that Plaintiff
"does have well documented Chronic Pain issues. No question."
(Keane Decl. Ex. H.)  However, Dr. Dinello noted, the MWAP Policy
"encourages . . . Providers to find safer alternative treatment
modalities," which would "include safer medication . . . Lidocaine
Patches, Voltaren Gel, Cymbalta," other forms of therapy, and
"[e]ven Surgical Intervention if necessary." (Id.)  Dinello stated
that prescribing Plaintiff Neurontin "could be fine for now" and
that Plaintiff could be "weaned off [Neurontin] as alternative

---

[9] "EMG" is an acronym for the diagnostic electromyelogram.  (See
Mueller Decl. ¶ 15.)

treatment modalities are attempted." (Id.)  He attached a list of
potential alternative medications to his email. (See id.)  After
Dr. Andola responded the next day to ask if Dr. Dinello's email
constituted approval of her MWAP Request and to report that
Plaintiff had reported in a visit to her that day that Neurontin
improved the "pins and needles, numbness, and pains in his legs,"
Dr. Dinello responded within fifteen minutes that Dr. Andola's
MWAP request for Neurontin "ha[d] not been approved" and that he
"[s]uggest[ed] alternative treatment[.]" (Keane Decl. Ex. I.)

Over the remainder of that week, Dr. Andola exchanged emails
with Dr. Mueller and Dr. Dinello about what the appropriate
alternative course of treatment would be for Plaintiff. (See Keane
Decl. Exs. J-M.)  Dr. Andola expressed confoundment that the RMDs
had not approved Neurontin, noted that the medication supported
the sort of pain caused by nerve damage that Plaintiff was
suffering from, noted that Plaintiff was already using several
alternative treatment options Dr. Dinello and Dr. Mueller had
suggested, and expressed doubt that certain other of their
suggested medication alternatives would be medically appropriate
for Plaintiff. (See Keane Decl. Ex. J.)

Dr. Mueller then suggested Dr. Andola prescribe Lamictal,
noting its use for "long-term treatment of neuropathy" and lack of
abuse potential, and both she and Dr. Dinello offered to help
Dr. Andola with its dosage and titration. (See Keane Decl. Exs. K,

L.)  Dr. Andola told the RMDs that she had "no comfort level" and no experience with Lamictal.  (See Keane Decl. Ex. L.)  After explaining Lamictal's use and its risk potential, the RMDs informed Dr. Andola that the plan was to wean Plaintiff off Neurontin and then start his Lamictal regimen.  (See id.)

Dr. Mueller asserts that upon receiving the MWAP Request to continue prescribing Plaintiff Neurontin on June 9, 2017, she reviewed Plaintiff's medical records and employed a multifactor analysis that, she says, was her general practice when reviewing MWAP Requests.  (See Mueller Decl. ¶¶ 14, 18, 32.)  Dr. Mueller notes that among the criteria she would typically consider in this evaluation were:  the treating physician's diagnosis of the inmate; results of specific diagnostic tests that supported or undercut that diagnosis; the underlying cause of the inmate's pain; and the social and disciplinary history of the inmate, including any history of drug abuse, addiction, or diversion.  (See id. ¶¶ 14-20.)  She states that after reviewing Plaintiff's medical records and considering the standard criteria she typically employed, she determined that Dr. Andola should treat Plaintiff with "safer and more effective modalities," which "were available and could be tried."  (See id. ¶¶ 32, 35.)

For his part, Dr. Dinello asserts that it was his practice when reviewing MWAP Requests to "consider all information, both medical and social" before determining whether to approve the

prescription requested.  (Dinello Decl. ¶ 18.)  Like Dr. Mueller,
such criteria included the inmate's underlying diagnosis,
information supporting that diagnosis such as the results of
specific tests, and any personal history of drug abuse, addiction,
or diversion.  (See id. ¶¶ 19-20.)  Dr. Dinello states that upon
reviewing Dr. Andola's MWAP Request for Neurontin and Plaintiff's
medical records, he believed that the physicians should encourage
"alternative, and safer, treatment modalities" for Plaintiff,
specifically "non-habit-forming treatment alternatives."  (Id.
¶¶ 29, 31.)  As described above, the alternative modalities Dinello
suggested included Lidocaine patches, Voltaren gel, Cymbalta, and
possibly surgery.  (See id. ¶ 34; see also Keane Decl. Ex. H.)
Dinello indicates that this medical judgment was based upon what
Plaintiff's medical records purportedly revealed was a history of
substance abuse and allegations of medication diversion.  (See
Dinello Decl. ¶ 30.)  Dr. Dinello also indicates that he believed
the alternative treatments he suggested were safer for Plaintiff
because Plaintiff's history indicated he was vulnerable to the
risks of addiction and abuse that are present when taking MWAP
medications.  (See id.)

Both Dr. Mueller and Dr. Dinello also assert that Neurontin
was "well documented" as an "extremely problematic
medication . . . within Corrections, where it had been frequently
diverted and misused."  (Mueller Decl. ¶ 31; see also Dinello Decl.

¶ 43.)  Although, both RMDs note, Neurontin is not an opioid, it possesses addictive qualities and potentially serious side effects.  (See Mueller Decl. ¶ 31.)

After her exchange with Dr. Mueller and Dr. Dinello, Dr. Andola weaned Plaintiff off Neurontin and continued prescriptions for Elavil, Ibuprofen, and Tylenol.[10]  (See SRD 56.1 Stmt. ¶ 42.)  On July 20, 2017, Dr. Andola met with Plaintiff, who reported he was unhappy with the pain relief he was receiving as he was being weaned off Neurontin and treated with Elavil.  (See Andola Decl. ¶ 26.)  Dr. Andola noted Plaintiff was not experiencing any side effects from taking Elavil but that Plaintiff was "not a candidate for Cymbalta" because of its "known major drug to drug interaction with Elavil."  (Id.)

At several points over the next few years, Plaintiff complained to Dr. Andola about pain he was experiencing.  In August 2017, Plaintiff complained of back pain and a lack of sleep as he was being weaned off Neurontin.  (See id. ¶ 27.)  On March 8, 2018, Plaintiff requested Neurontin to treat his pain, but Dr. Andola

_____

[10] Dinello and Mueller both assert that Plaintiff was also prescribed Lamictal but refused to take it.  (See SRD 56.1 Stmt. ¶¶ 42-43; Mueller Decl. ¶ 40.)  However, Plaintiff disputes this, (see Pl. 56.1 Stmt. at 26-27; dkt. no. 70 at 12), and Dr. Andola states she did not prescribe Plaintiff Lamictal because she "was not comfortable with its use for" him, (see Andola Decl. ¶ 25).  The Court credits Dr. Andola's assertion and concludes Plaintiff was not prescribed, and did not refuse, a prescription for Lamictal.

asserts that she could not have prescribed it for him because RMDs Mueller and Dinello had already denied her MWAP Request. (See id. ¶ 29.)  That same day, Plaintiff refused to leave Eastern for an ultrasound of his liver because, he told Dr. Andola, he did not want to be restrained by handcuffs or shackles for such an "outside trip." (See id.)

### 5. The October 4, 2018, MWAP Request for Lyrica

On October 4, 2018, Plaintiff requested a trial of Lyrica to treat his pain. (See id. ¶ 30.)  That same day, Dr. Andola submitted a new MWAP Request for a 30-day prescription of 75 mg of Lyrica to Dr. Mueller. (See id. ¶ 31; see also Keane Decl. Exs. N-O; NSRD 56.1 Stmt. ¶ 20; SRD 56.1 Stmt. ¶ 47.)  Dr. Mueller denied the MWAP Request for Lyrica, noting in her response that Andola had not provided "[a]ctual results" of Plaintiff's EMG with her request or mentioned other prescription modalities, and that she could not find any references to pertinent consultations with specialists. (See Keane Ex. N. at 2.; SRD 56.1 Stmt. ¶ 49.)  Dr. Mueller also recommended to Dr. Andola that Andola refer Plaintiff for physical therapy, or to an orthopedist or neurologist, and recommended treating Plaintiff's pain with non-steroidal anti-inflammatory medications or topical treatments like "Dolorac, Capsin . . .Lidoderm patch[es], Cymbalta," and others. (See Keane Ex. N. at 2; SRD 56.1 Stmt. ¶ 50; Mueller Decl. ¶ 45.)  In her email response, Dr. Mueller also asserted both that

12

Plaintiff had a history of substance abuse and had received tickets for drug use at Eastern.  (<u>See</u> Keane Decl. Ex. P.)  In response, Dr. Andola stated that Plaintiff "apparently is not a good candidate for mwap medication" but noted that the two drug tickets Mueller had mentioned in her prior email were "not recent by medical standards as [they were] over 6 months" old.  (<u>Id.</u>)

Mueller asserts that her decision to deny the MWAP Request for Lyrica was based on her "medical judgment," including the topics she mentioned in her email to Dr. Andola about the lack of information about recent physical therapy treatment and the lack of specialist referrals, as well as the facts that Dr. Andola apparently had not first attempted other medications, that Plaintiff had a history of substance abuse, and Lyrica's "addictive properties" and propensity to cause "serious side effects" and "withdrawal symptoms when abruptly discontinued." (Mueller Decl. ¶ 44.)  She asserts that her medical judgment indicated that the medically appropriate course at that time was to pursue "safer and likely more effective avenues of treatment" than Lyrica.  (<u>Id.</u> ¶ 49.)

Dr. Dinello was not involved in any decision regarding the MWAP Request for Lyrica Dr. Andola submitted on October 4, 2018. (<u>See</u> SRD 56.1 Stmt. ¶ 48.)

6.  <u>Subsequent Events</u>

After Dr. Mueller denied the MWAP Request for Lyrica, Dr. Andola continued to treat Plaintiff, including prescribing additional accommodations—such as a cane, a knee brace, and gel insoles—to help with his pain. (<u>See</u> Andola Decl. ¶¶ 32, 35.)  On May 20, 2019, Plaintiff asked Dr. Andola to be restarted on Neurontin after complaining of severe insomnia and bad reactions to Elavil. (<u>See</u> <u>id.</u> ¶ 33.)  In response, Dr. Andola reminded him that the RMDs had previously denied her MWAP Request for Neurontin. (<u>See</u> <u>id.</u>)  On July 28, 2020, Dr. Andola saw Plaintiff, who complained of "constant chronic pain" and commented both that Ultram and Neurontin had previously helped him and that Elavil helped his pain with "no side effects." (<u>See</u> <u>id.</u> ¶ 36.)

Dr. Andola asserts that in late 2020, in response to a request from DOCCS, she filled out an assessment in which she noted that Plaintiff had refused to consider surgery on his lumbar spine and refused to undergo physical therapy, and stated her concern that he desired to take "habit-forming, addictive medications[.]" (<u>See</u> <u>id.</u> ¶¶ 40-41.)  She reports that Plaintiff repeatedly told her he did not want to take trips outside of Eastern, including for medical testing or consultations, because he would have to be physically restrained by shackles during such trips. (<u>See</u> <u>id.</u> ¶ 37.)

14

Plaintiff testified that, at some point after his Neurontin prescription was discontinued, he told Dr. Gusman that he was in pain, that he felt Neurontin had previously treated his pain effectively, and that none of the medications he was taking as alternatives to Neurontin were treating his pain effectively. (See Agnew Decl. Ex. 25 at 209:14-210:11.)

DOCCS rescinded the MWAP Policy on February 8, 2021. (See SRD 56.1 Stmt. ¶ 6.)

**B. Procedural History**

The instant case arises from a class action lawsuit brought by Plaintiff and several other named DOCCS inmates on behalf of a class of individuals in DOCCS custody whose medications were denied or discontinued after the institution of the MWAP Policy. (See Allen I, 19-cv-8173, dkt. no. 371 at 7.)  On March 31, 2023, this Court issued an opinion granting the Allen I plaintiffs' motion to certify a class to pursue injunctive relief but denying the plaintiffs' motion to certify a class to pursue damages for liability.  See Allen I, No. 19-cv-8173 (LAP), 2023 WL 2731733, at *6 (S.D.N.Y. Mar. 31, 2023).  The Court held that plaintiffs in Allen I had failed to show that the proposed "liability class" had standing to sue under Article III of the United States Constitution.  See id. at *2.

Following this Court's denial of certification of a "liability class," Plaintiff filed the instant individual suit for

damages on June 30, 2023.  (<u>See</u> Compl.)  In his complaint, Plaintiff asserted two claims under 42. U.S.C. § 1983 for deliberate indifference to his medical needs due to DOCCS's implementation of the MWAP Policy and the discontinuation and denial of Plaintiff's medications that ensued.  (<u>See</u> <u>id.</u> ¶¶ 318-40.)

On November 15, 2023, the Non-State Represented Defendants moved for summary judgment.  (<u>See</u> dkt. no. 22.)  The State Represented Defendants filed their motion for summary judgment on November 16, 2023.  (<u>See</u> dkt. no. 26.)

## II.  <u>**Legal Standard**</u>

Summary Judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "'It is the movant's burden to show that no genuine factual dispute exists.'" <u>I.M. v. United States</u>, 362 F. Supp. 3d 161, 189 (S.D.N.Y. 2019) (quoting <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a judgment for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" <u>Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.</u>, 746

F.3d 538, 544 (2d Cir. 2014) (quoting <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248).

"'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.'" <u>In re AXA Equitable Life Ins. Co. COI Litig.</u>, 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (quoting <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995)).  In ruling on a motion for summary judgment, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." <u>Brod v. Omya, Inc.</u>, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

"If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" <u>Kayo v. Mertz</u>, 531 F. Supp. 3d 774, 787 (S.D.N.Y. 2021) (quoting <u>Jaramillo v. Weyerhaeuser Co.</u>, 536 F.3d 140, 145 (2d Cir. 2008)). "The non-moving party 'cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'" <u>In re AXA</u>, 595 F. Supp. 3d. at 215 (quoting <u>Gottlieb v. County of Orange</u>, 84 F.3d 511, 518 (2d Cir. 1996)).  The non-

moving party must "create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" Wrobel v. Cnty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

III. **Applicable Law**

A. Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits government officials from inflicting "cruel and unusual punishments" on those in their care.  U.S. Const. amend. VIII.  Pursuant to the right to be free from cruel and unusual punishments, the Eighth Amendment prohibits prisons officials from acting with "deliberate indifference to serious medical needs of prisoners[.]"  Estelle v. Gamble, 429 U.S. 97, 104 (1976).

A prison official can be held liable for deliberate indifference in violation of the Eighth Amendment "only when two requirements are met."  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (internal quotations and citations omitted), abrogated in part on other grounds by Kravitz v. Purcell, 87 F.4th 11 (2d Cir. 2023).  The first requirement the plaintiff must meet "is objective:  the alleged deprivation of adequate medical care must be 'sufficiently serious.'"  Id. (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  The second requirement "is subjective:

18

the charged official must act with a sufficiently culpable state of mind." Id. at 280.  Put differently, a plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003) (citing Estelle, 429 U.S. at 104).

Satisfying the objective prong entails two inquires.  First, the Court must assess "whether the prisoner was actually deprived of adequate medical care." Salahuddin, 467 F.3d at 279.  The second part of the objective inquiry asks whether the deprivation or inadequacy of the plaintiff's medical care is "sufficiently serious." See id. at 280.

Determining if the deprivation of medical care is sufficiently serious is "necessarily contextual and fact-specific" which requires "tailor[ing] [it] to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (cleaned up) (internal quotations and citations omitted).  This includes examining the plaintiff's claim differently depending on whether he alleges the prison officials completely "fail[ed] to provide any treatment for [his] medical condition" or alleges only that the medical treatment he received was inadequate.  See Salahuddin, 467 F.3d at 280.

If the former, the Court must "examine whether the inmate's medical condition is sufficiently serious." Id. at 280 (emphasis added).  Certain factors courts consider when evaluating the

seriousness of a medical condition include whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment," whether the condition "significantly affects an individual's daily activities," or "the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations and citations omitted). If, however, the plaintiff alleges only "inadequacy [] in the medical treatment [he was] given, the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280.  Instead of determining the seriousness of the plaintiff's underlying condition, the Court must focus its inquiry "on the challenged delay or interruption in treatment[.]" Id. (citing Smith, 316 F.3d at 185).  Such inquiry requires the Court to examine "the particular risk of harm" the plaintiff faced as a result of the deprivation, "rather than the severity of the [plaintiff's] underlying medical condition[.]" Smith, 316 F.3d at 186.

Accordingly, the Court inquires how serious the plaintiff's underlying medical condition is if he alleges he was entirely denied care, whereas it must assess the "particular risks attributable" to a provision of allegedly insufficient care or the "severity of [a] temporary deprivation" in care if that is the deprivation the plaintiff alleges.  Id. at 186-87 (emphasis added).

20

To satisfy the subjective prong, i.e., to prove a prison official was deliberately indifferent to his or her medical needs, a plaintiff must "show that a particular defendant 'knows of and disregards an excessive risk to inmate health or safety.'" Brock, 315 F.3d at 164 (quoting Farmer, 511 U.S. at 837).  This standard is akin to a mental state of subjective recklessness, as used in criminal law.  See Salahuddin, 467 F.3d at 280.  The plaintiff may demonstrate the defendant's knowledge either by proving the official had actual knowledge of the risks to the plaintiff's health or by proving "that the risk was obvious or otherwise must have been known to [the] defendant[.]"  Brock, 315 F.3d at 164.

**B. Personal Involvement**

Plaintiff asserts his Eighth Amendment claim pursuant to 42 U.S.C. § 1983.  (See Compl. ¶¶ 318-40.)  To prevail on a § 1983 claim for a constitutional violation, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  Thus, to establish a particular defendant's liability, Plaintiff must "establish that [the particular defendant] violated the Eighth Amendment by [his or her] own conduct, not by reason of [his or her] supervision of others who committed the violation" and that each particular defendant "knew of and disregarded an excessive

21

risk to [Plaintiff's] health or safety." Id. at 619 (citing Vega v. Semple, 963 F.3d 259, 273 (2d Cir. 2020)).

Such personal involvement requires "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred[.]" Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

### C. Qualified Immunity

The Supreme Court has held that "[g]overnment officials are entitled to qualified immunity [from liability] with respect to 'discretionary functions' performed in their official capacities." Ziglar v. Abbasi, 582 U.S. 120, 150 (2017) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). Whether a government official can invoke qualified immunity "turns on the 'objective legal reasonableness' of the official's acts." Id. at 151 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). The reasonableness of the official's actions "must be 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.'" Id. (quoting Creighton, 483 U.S. at 639).

To determine whether the official violated rights that were "clearly established," the Court "must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." Id. at 152 (internal

quotations and citations omitted).  "[I]f a reasonable officer might not have known for certain that the conduct was unlawful[, ] then the officer is immune from liability." Id.  As the Supreme Court phrased differently in a previous case, the "right must be sufficiently clear that every reasonable official would have understood that what he [wa]s doing violate[d] that right." Taylor v. Barkes, 575 U.S. 822, 825 (2015) (internal quotations and citations omitted).

When confronted with the qualified immunity defense, the Court must determine the scope of the right that the plaintiff asserts was clearly established and that the official violated. There need not exist "a case directly on point" that addresses facts perfectly analogous to the instant case before the Court, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. (internal quotations and citations omitted).  In other words, "the precise conduct at issue need not previously have been ruled unlawful" for the Court to conclude that the right was clearly established. Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015) (summary order) (citing Zahrey v. Coffey, 221 F.3d 342, 357 (2d Cir. 2000)).  As the Court of Appeals has noted in the specific context of claims of deliberate indifference in violation of the Eighth Amendment, assertions of qualified immunity "are not analyzed body-part by body-part" or with "specificity as to the site and cause of

23

pain[.]" <u>Collymore v. Krystal Myers, RN</u>, 74 F.4th 22, 30 (2d Cir. 2023). Such a "restricted view of the right" alleged to have been violated would be unnecessarily narrow in determining whether the right was clearly established at the time of its alleged violation. <u>See</u> <u>LaBounty v. Coughlin</u>, 137 F.3d 68, 74 (2d Cir. 1998).

On the other hand, "the clearly established right must be defined with specificity," and the "dispositive question is whether the violative nature of <u>particular</u> conduct is clearly established." <u>Vega</u>, 963 F.3d at 275 (emphasis in original) (internal quotations and citations omitted). Accordingly, the Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." <u>Id.</u> In the context of claims for deliberate indifference, this means "'sufficiently serious' medical conditions 'should not be defined at a high level of generality.'" <u>Collymore</u>, 74 F. 4th at 30 (quoting <u>White v. Pauly</u>, 580 U.S. 73, 79 (2017)).

## IV. **Discussion**

### A. **Plaintiff's Claim for Deliberate Indifference**

1. <u>Objective Prong: Whether Plaintiff Suffered a Sufficiently Serious Deprivation of Adequate Medical Care</u>

The State Represented Defendants argue Plaintiff cannot show a deprivation of care sufficiently serious to satisfy the objective prong of the deliberate indifference inquiry because he was offered alternative medications and treatments that the State Represented

24

Defendants contend were "safer modalities than [the medications] he preferred." (See SRD Br. at 19-20.) Specifically, they argue that because Plaintiff "was offered and received medical care and treatment" alternatives to the prescriptions of Neurontin and Lyrica that Dr. Andola requested on his behalf, Plaintiff can only show that the "deprivation" of these medications from him was sufficiently serious if it exposed him to the "'particular risks attributable'" to choosing treatment alternatives in lieu of Neurontin and Lyrica. (See id. at 19 (quoting Smith, 316 F.3d at 187).) The State Represented Defendants contend that Plaintiff cannot show he was exposed to such "particular risks." See id.

The State Represented Defendants provide the correct standard by which this Court must assess whether the deprivation of Plaintiff's medical care was sufficiently serious. See Smith, 316 F.3d at 187. However, they fail to engage in the very "sufficiently serious" analysis that they propose the Court follow and that precedent demands. The State Represented Defendants fail to grapple with the reality that, even if the courses of treatment that they recommended as alternatives to Neurontin and Lyrica were "safer" because they carried fewer risks of substance abuse or addiction than did Neurontin and Lyrica, opting for such alternatives came with "particular risks" of their own. Namely, the risks attributable to denying Plaintiff Neurontin or Lyrica

25

are that Plaintiff would suffer chronic and substantial pain to a greater degree than he would have had he been prescribed either of those medications and that he would suffer greater pain than was necessary given his condition.

The Court need look no further than State Represented Defendants' own submissions to conclude that such risks to Plaintiff were present when they opted not to grant Dr. Andola's request to continue Plaintiff's Neurontin prescription.  The State Represented Defendants note that Plaintiff "has a history of neck and joint pain, with known neuropathy, severe arthritis," as well as "chronic neck and arm pain" and a "history of back pain and peripheral neuropathy."  (SRD 56.1 Stmt. ¶ 11.)  In his email to Dr. Andola on June 14, 2017, Dr. Dinello noted that Plaintiff "does have well documented Chronic Pain Issues.  No question."  (See Keane Decl. Ex. H.)  Dr. Andola emailed Dr. Dinello and Dr. Mueller the next day to tell them, in part, that Plaintiff told her that the "pins and needles, numbness, and pains in [his] legs [were] better" when he was taking the Neurontin.  (Keane Decl. Ex. I.) Dr. Andola separately noted that Plaintiff had been diagnosed with lumbar levoscoliosis and degenerative disc disease throughout his cervical, thoracic, and lumbar spine.  (See Andola Decl. ¶ 12.) Although not exhaustive, the record demonstrates that Plaintiff suffered serious, chronic pain in multiple parts of his body, which manifested itself in multiple symptoms and that the Neurontin he

had previously taken helped to alleviate that pain.  The record
also shows that the State Represented Defendants were aware of
Plaintiff's chronic pain issues, his report that the Neurontin
improved his pain symptoms, and Dr. Andola's insight that
Plaintiff was already using the RMDs' proposed alternative
treatment options and her doubt that certain other alternatives
would be medically appropriate for Plaintiff.

Therefore, the State Represented Defendants cannot credibly
argue that there were no "particular risks attributable" to denying
Dr. Andola's MWAP requests for Neurontin and Lyrica and opting
instead for alternative treatment modalities for Plaintiff's pain.
The particular risk inherent in the State Represented Defendants'
decision is the aggravation of Plaintiff's documented chronic pain
if he were to be weaned off—or, in the case of Lyrica, denied—a
medication that treats such pain.  The risk that Plaintiff would
suffer chronic and substantial pain due to the denial of the
requests to prescribe Neurontin and Lyrica is a severe enough
deprivation of care to make these denials sufficiently serious.
See Smith, 316 F.3d at 186-87.  Thus, because denying Dr. Andola's
MWAP Requests for Neurontin and Lyrica placed Plaintiff at risk of
aggravated and chronic pain in several places on his body, such
denial satisfies the objective prong of the deliberate
indifference inquiry.

27

The Non-State Represented Defendants similarly fail to grapple with the fact that denying Plaintiff Neurontin and Lyrica created a "particular risk[]" that Plaintiff would suffer a greater degree of pain than he would have had to endure had he been prescribed those medications.  See Smith, 316 F.3d at 187.  They point to the numerous other prescriptions and accommodations Dr. Andola gave Plaintiff to treat his pain, which the Non-State Represented Defendants argue was "reasonable and, therefore adequate [care] under the Eighth Amendment."  (NRSD Br. at 16.)

However, this argument misses the mark.  As described above, even though Dr. Andola may have provided Plaintiff numerous treatment alternatives to Neurontin and Lyrica, such alternative care may still have deprived Plaintiff of adequate care by creating "particular risks" that he would suffer "chronic and substantial pain" without the requested medications.  See Smith, 316 F.3d at 187; Chance, 143 F.3d at 702.  Because the decision to provide Plaintiff these alternative treatments—rather than Neurontin and Lyrica—gave rise to a risk that Plaintiff would suffer chronic pain to a greater degree than he would have on those medications, the alleged deprivation of care is sufficiently serious under the objective prong of the Eighth Amendment inquiry. See Smith, 316 F.3d at 186-87.

2.   <u>Subjective Prong:   Whether Defendants Consciously Disregarded an Excessive Risk of Harm to Plaintiff's Health</u>

The State Represented Defendants argue that they lacked the "requisite culpable state of mind" necessary to satisfy the subjective prong of the deliberate indifference inquiry.  (<u>See</u> SRD Br. at 11 (citing <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994).)  According to the State Represented Defendants, the Court cannot conclude they were deliberately indifferent to Plaintiff's medical needs because they concluded that the "long-term use of Neurontin," which has "addictive properties and side effects," yielded to "safer alternative modalities and medications" after they "engaged in a comprehensive review of [his] medical history" that included a history of substance abuse.  (<u>Id.</u> at 15 (citations omitted).)  They contend that their review and denial constituted "principled decisions" based on medical judgments about the proper way to treat Plaintiff that differed from the courses of action Dr. Andola  initially  sought—prescriptions  for  Neurontin  and Lyrica.  (<u>See</u> <u>id.</u> at 11-13.)  As the State Represented Defendants would  have  it,  because  their  decisions  "not  [to]  leav[e] Plaintiff's  pain  untreated,  but  [to]  recommend[]  several  safer alternative treatments and medications" and minimize the risks of substance  abuse  and  addiction  were  deliberative  and  grounded  in medical  considerations,  they  lacked  the  recklessness  necessary  to

establish deliberate indifference to his medical needs. (Id. at 11, 16.)

The State Represented Defendants correctly assert both that mere disagreement with Dr. Andola over the superior course of treatment and allegations of medical malpractice do not qualify as deliberate indifference to Plaintiff's medical needs. (See id. at 10-11, 17 (citing Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), and Chance, 143 F.3d at 703).) There is little question that if that is all Plaintiff alleged or all that the evidence illustrated, the State Represented Defendants would likely be entitled to summary judgment. Indeed, the State Represented Defendants have sufficiently demonstrated, through their email exchanges with Dr. Andola, that they did not immediately and automatically deny Dr. Andola's MWAP Requests for Neurontin and Lyrica and instead reviewed Plaintiff's medical records, considered Plaintiff's social history against the drugs' risks of addiction and abuse, and ultimately concluded it would be safer not to prescribe Plaintiff those medications. (See Keane Decl. Exs. D-O.)

However, the key inquiry when determining subjective indifference is whether a particular defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Brock, 315 F.3d at 164 (citing Farmer, 511 U.S. at 837).

30

a. *The SRDs' Denial of Neurontin*

With respect to the MWAP Request for Neurontin, the record evidence demonstrates that a reasonable jury could conclude that the State Represented Defendants disregarded an excessive risk that Plaintiff would suffer a great and unnecessary degree of chronic pain if they did not approve the renewal of his Neurontin prescription.   Accordingly, the Court cannot grant the State Represented Defendants' summary judgment motion with respect to the denial of the MWAP Request for Neurontin.

As to Dr. Mueller, she describes in detail the process she would typically undertake when she received an MWAP Request and the criteria she would typically consider when she evaluated whether to approve such requests.   (See Mueller Decl. ¶¶ 14-21.) She asserts that it was her practice to "consider all criteria" and "tak[e] into account multiple factors, primarily the medical and social history of the particular patient," when making such determination.   (Id. ¶¶ 14, 18.)   She states that she "reviewed the Plaintiff's medical records" and "consider[ed] all of the factors" after receiving Dr. Andola's MWAP Request for Neurontin on June 9, 2017, upon which she determined that "safer modalities should be followed."   (Id. ¶¶ 23, 32.)

However, Dr. Mueller never specifies which of the criteria or factors that she typically evaluated when analyzing an MWAP Request she actually considered before she and Dr. Dinello denied

Dr. Andola's request for Neurontin.  Mueller recites Plaintiff's medical history and the treatments he had previously received for his various maladies, (see id. ¶ 24), but provides no indication as to how Plaintiff's history of chronic pain or the treatments he had received for such pain factored into her decision to deny the request for Neurontin.  Stating that she "reviewed the Plaintiff's medical records" cannot, in itself, demonstrate that Dr. Mueller considered the risk of exacerbating Plaintiff's chronic pain if his Neurontin was discontinued or even that she considered whether the "safer modalities" she and Dr. Dinello recommended would treat his pain adequately.  (See id. ¶¶ 23, 32.)  Here, Plaintiff's medical records made clear that for years he had suffered serious chronic pain which was treated with Neurontin—as well as other treatments—for a period of time.  The State Represented Defendants have put forth no contention or evidence that Dr. Mueller specifically considered the efficacy of Plaintiff's prior Neurontin treatment or the risk that Plaintiff's pain would worsen if he was taken off Neurontin in favor of an alternative treatment.  Accordingly, they have not shown, as a matter of law, that Dr. Mueller did not disregard an excessive risk that Plaintiff's pain would deteriorate when she reviewed and denied Dr. Andola's MWAP Request for Neurontin.  See Brock, 315 F.3d at 164.

Dr. Mueller implies—but does not say explicitly—that she did specifically consider Plaintiff's social history, including his

history of substance abuse, as well as the "addictive qualities
and potentially serious side-effects" of Neurontin when she
received the MWAP Request for the medication in June 2017.  (See
Mueller Decl. ¶¶ 31-32.)  Although it appears from Dr. Mueller's
own assertions and from the record that these were some of the
factors she considered when reviewing the MWAP Request for
Neurontin, such consideration cannot overcome the apparent lack of
counterweight to the risk of excessive pain that Plaintiff might
suffer if he were to be taken off Neurontin.

Therefore, the Court cannot find that Dr. Mueller lacked the
reckless state of mind necessary to violate Plaintiff's Eighth
Amendment rights.  As described above, the record does not show
that she properly considered the "excessive risk to [Plaintiff's]
health or safety"—namely, the risk of excessive pain—that would
result from denying the MWAP Request for Neurontin.  See Brock,
315 F.3d at 164 (quoting Farmer, 511 U.S. at 837).  The Court
cannot grant summary judgment as to Dr. Mueller for the Neurontin
MWAP Request denial.

For the same reasons, the Court cannot grant summary judgment
to Dr. Dinello for the denial of the June 9, 2017, MWAP Request
for Neurontin that Dr. Andola submitted.  Like Dr. Mueller,
Dr. Dinello attests to his standard practice of considering an
inmate's medical and social history when reviewing an MWAP Request
and asserts that after receiving Dr. Andola's MWAP Request for

Neurontin and reviewing Plaintiff's medical records, his medical
judgment indicated that Dr. Andola should try alternative
treatments to treat Plaintiff's pain.  (See Dinello Decl. ¶¶ 18-
20, 30.)  While Dr. Dinello states that he preferred alternative
treatments because he believed they were safer and presented lesser
risks of addiction and abuse than those associated with Neurontin,
(see id. ¶ 30), his assertions about his medical judgment are
lacking in specificity about what in his review of Plaintiff's
medical record ultimately led to his conclusion.

More particularly, Dr. Dinello does not specify what facts in
Plaintiff's medical history he believed made Plaintiff vulnerable
to substance abuse, what specific properties of Neurontin he
believed made Plaintiff vulnerable to abusing the medication, or,
most pertinent, what consideration he gave—if any—to the
seriousness of Plaintiff's chronic pain and what treatment would
address that pain most effectively.  Although Dr. Dinello mentions
Plaintiff's history of substance abuse and medication diversion,
(see id.), he does not specify which incidents of abuse or
diversion cautioned against prescribing Neurontin or what weight
he gave such history in his overall evaluation of the MWAP Request.
Nor does he state why Neurontin in particular might pose a risk to
Plaintiff's habits.  He states only that Plaintiff's history of
substance abuse and diversion "increased the risk of MWAP
medications given [Plaintiff's] particular circumstances" and,

34

therefore, "treatment alternatives with a safer risk/benefit ratio" were preferable. (Id. ¶¶ 30-31, 33.) Without more specificity, the Court might reasonably conclude that <u>any</u> history of substance abuse or diversion might have led Dr. Dinello to deny <u>any</u> request to treat Plaintiff with an MWAP medication.

And, although Dr. Dinello mentions the "risk/benefit ratio" of continuing Plaintiff's Neurontin prescription, he gives no indication that he considered the benefits to Plaintiff that might come from granting Dr. Andola's request. Dr. Dinello's emails to Dr. Andola make clear that he knew how serious Plaintiff's pain condition was. (<u>See</u> Keane Decl. Ex. H (noting Plaintiff "does have well documented Chronic Pain Issues. No question.").) But there is no information about what medications or treatments Dr. Dinello believed would provide Plaintiff the benefit of pain mitigation. Nor is there any indication that Dr. Dinello evaluated how effective Neurontin had been at treating Plaintiff's pain before Dr. Andola submitted her MWAP Request. In other words, the evidence the State Represented Defendants submitted shows not that Dr. Dinello gave much consideration to the seriousness of Plaintiff's pain or the optimal way to treat it but that he looked instead only for treatments that would minimize risks of abuse.

Accordingly, the State Represented Defendants have not demonstrated, as a matter of law, that Dr. Dinello did not disregard an excessive risk of which he was aware—namely, that

denying Dr. Andola'a MWAP Request for Neurontin would exacerbate Plaintiff's chronic pain.   Because the State Represented Defendants failed to defeat Plaintiff's argument on the subjective prong of the deliberate indifference inquiry, the Court cannot grant summary judgment to Dr. Dinello for his denial of the Neurontin MWAP Request.   See Brock, 315 F.3d at 164.

b.   *The SRDs' Denial of Lyrica*

Dr. Mueller's denial of Dr. Andola's October 4, 2018, MWAP Request to prescribe Plaintiff Lyrica presents a closer call regarding her attention or indifference to Plaintiff's medical needs.   As she did in response to Dr. Andola's MWAP Request for Neurontin, Dr. Mueller considered Lyrica's addictive properties, propensity to cause withdrawal symptoms, and side effects, as well as the concerns that the medication raised for patients with histories of substance abuse or psychiatric disorders, both of which, she says, were present with Plaintiff. (See Mueller Decl. ¶ 44.)   But in contrast to her assessment of the request for Neurontin, Dr. Mueller specifies that in response to the request for Lyrica, she evaluated the fact that Plaintiff had not received physical therapy for more than two years, that such physical therapy was limited in scope, and Plaintiff had refused some physical therapy sessions.   (See id.)   She also indicates that Dr. Andola's request did not reveal whether Plaintiff had been referred to any specialists and that she believed Plaintiff should

be referred to a pain management specialist, orthopedist, neurologist, or physical therapist. (See id. ¶¶ 44-45.) She also asserts that she believed that other medications Plaintiff could use would not only be safer but more effective at treating his pain. (See id. ¶ 45.)

All of this reflects Dr. Mueller's attention to Plaintiff's specific medical needs beyond a mere worry about his social history or the dangerous qualities of Lyrica—which is all that she previously exhibited in response to the MWAP Request for Neurontin. Dr. Mueller's actions reveal that she reviewed Plaintiff's treatment history and recommended paths underutilized or not yet taken to treat his pain, including directing him to appropriate specialists for further evaluation and putting him on other medications that would mitigate his pain effectively. Thus, unlike her denial of the Neurontin request, it appears that Dr. Mueller considered not only the risks of prescribing Plaintiff Lyrica but the relative effectiveness and benefit of the medication as well.

Accordingly, the record does not support that Dr. Mueller displayed a subjective disregard to the excessive risk that Plaintiff would suffer unnecessary additional pain should he have been denied a prescription for Lyrica. Therefore, Plaintiff cannot satisfy the subjective prong of his Eighth Amendment claim with respect to Dr. Mueller's denial of the October 4, 2018, MWAP Request for Lyrica.

### c. Dr. Andola's Subjective Treatment of Plaintiff

Plaintiff has raised a genuine dispute of material fact regarding Dr. Andola's subjective state of mind in and around both June 2017 and October 2018 that prevents the Court from granting her motion for summary judgment for the denials of her MWAP Requests for Neurontin and Lyrica.

Dr. Andola's argument that she was not subjectively reckless in her treatment of Plaintiff boils down to the assertions that she "attempt[ed] to get Plaintiff's Neurontin approved," (NSRD Reply at 5), through her emails with Dr. Mueller and Dr. Dinello and, when those attempts failed, "provided [Plaintiff] alternate accommodations" and "refused to prescribe [Plaintiff] certain medications that she believed would cause harm." (NSRD Br. at 17.) Dr. Andola indicates that these actions demonstrate she did all she could in the face of the MWAP Policy, which contained no written procedures she could follow to appeal denials like the ones Dr. Mueller and Dr. Dinello issued. (See NSRD Reply at 2-5.)

The Court acknowledges that the MWAP Policy severely restrained Dr. Andola's ability to prescribe Plaintiff the medications she believed were effective or necessary to treat his pain. However, the record contains substantial testimony from Dr. Mueller, Dr. Dinello, and Dr. Carl Koenigsmann stating that treating physicians could and would appeal informally to RMDs or to Dr. Koenigsmann directly to get the requested MWAP prescription

approved if the physicians believed it was the optimal course of treatment.  (See Manley Decl. Ex. C at 273:8-278:12; Manley Decl. Ex. E at 109:9-111:21; Manley Decl. Ex. I at 177:3-179:8.) Indeed, Dr. Koenigsmann stated that there were many occasions on which he approved a treating physician's MWAP Request after an RMD had denied it.  (See Manley Decl. Ex. E at 110:8-14.)  Although the Court takes Dr. Andola's point that the lack of any written appeal procedure in the MWAP Policy made any prospective appeal opaque and uncertain, the record reveals that there may have existed alternative pathways to get approval for the prescriptions for medications that she believed would most effectively treat Plaintiff's pain.  Whether Dr. Andola knew of these opportunities, sought to pursue them after either MWAP Request denial, or disregarded these options is a question of fact that cannot be resolved on the current record.

The lengthy back-and-forth Dr. Andola had over email with Dr. Mueller and Dr. Dinello in June 2017 to persuade them to approve her MWAP Request for Neurontin presents a close question as to her subjective state of mind about Plaintiff's medical care. She provided as much of the requested information from Plaintiff's medical history as she could, expressed her professional opinion about some of the RMDs' suggested alternative treatments, sought other treatment suggestions, and expressed comfort maintaining the treatment regimen Plaintiff was on at the time, which included

Neurontin.   (See Keane Decl. Exs. J-L.)   She certainly did not surrender her pursuit of Plaintiff's proper treatment quickly or easily.   However, as described above and despite the efforts Dr. Andola did take, the record is not clear whether she also knew of or pursued alternative channels to obtain a prescription for Neurontin to treat Plaintiff's pain, whether she knew of such paths to a Neurontin prescription approval and disregarded them after she exchanged emails with Dr. Dinello and Dr. Mueller in June 2017, or whether she knew of and disregarded effective pain medications that she could seek to prescribe for Plaintiff other than the Neurontin he specifically requested and continued to request.

The October 4, 2018, MWAP Request for Lyrica presents a much less narrow question of fact.   The record does not reveal Dr. Andola made any attempt to obtain a prescription for Lyrica after Dr. Mueller denied the request.   One day after the denial, Dr. Andola thanked Dr. Mueller for "consider[ing]" the MWAP Request and seemed to accept that "apparently [Plaintiff] is not a good candidate for mwap medication." (Keane Ex. P.)   Given that Dr. Andola knew the degree of pain Plaintiff was suffering at the time, her apparently ready acceptance of Dr. Mueller's denial paints an even more plausible picture of a subjective disregard of Plaintiff's medical needs.   And, as discussed above regarding the denial of Dr. Andola's MWAP Request for Neurontin, there is no evidence in the record indicating if she knew of and disregarded

effective pain medications that she could seek to prescribe for Plaintiff other than the Lyrica he had specifically requested.

Accordingly, the Non-State Represented Defendants have not put forth sufficient evidence to defeat Plaintiff's contention that Dr. Andola knew of and disregarded an excessive risk that the course of action and course of treatment she chose after the MWAP Request denials would exacerbate Plaintiff's chronic pain. Because there remain genuine disputes as to Dr. Andola's subjective state of mind in treating Plaintiff, the Non-State Represented Defendants' motion as to Dr. Andola is denied. See Liberty Lobby, Inc., 477 U.S. at 248.

**B. Dr. Gusman's and Dr. Dinello's Personal Involvement**

Dr. Gusman has failed to demonstrate that, as a matter of law, he cannot be held liable because he was not personally involved in the deprivation of Plaintiff's medical care. To establish liability, Plaintiff is required to plead and demonstrate that Dr. Gusman directly participated in or failed to remedy the unconstitutional deliberate indifference to his medical needs. See Iqbal, 556 U.S. at 676; Black, 76 F.3d at 74. The only allegation in Plaintiff's complaint mentioning Dr. Gusman that relates to alleged incidents of deliberate indifference is that Dr. Gusman was "cc'd" on an email Dr. Andola sent to Dr. Dinello and Dr. Mueller providing additional information Dr. Mueller had requested upon receiving the MWAP Request for

41

Neurontin.  (See Compl. ¶ 294.)  This allegation alone would be insufficient to show that Dr. Gusman directly participated in denying Plaintiff the Neurontin Dr. Andola requested for Plaintiff or that he failed to act to remedy an unconstitutional act.  See Iqbal, 556 U.S. at 676; Black, 76 F.3d at 74.

However, the evidentiary record presents a question of fact for the jury regarding whether Dr. Gusman was personally involved in denying Plaintiff adequate medical care.  The evidentiary support upon which Plaintiff relies to assert Dr. Gusman's personal involvement are (1) the emails in June 2017 on which Dr. Gusman was copied regarding Dr. Andola's MWAP Request for Neurontin, and (2) Plaintiff's own deposition testimony in which he asserted both that he had been treated by Dr. Gusman after he was taken off Neurontin and that he told Dr. Gusman that Neurontin had treated his pain effectively and that the alternative treatments on which he had been placed were not as effective.  (See Pl. Opp. at 53-54; Agnew Decl. Ex. 25 at 209:14-210:15.)

Mere receipt of information of alleged deprivation of constitutional rights is, in itself, insufficient to establish personal involvement.  See Goris v. Breslin, 402 F. App'x 582, 584 (2d Cir. 2010) (citing Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997)).  In Goris, the Court of Appeals affirmed the district court's holding that a defendant was not sufficiently involved in deliberate indifference to the plaintiff's medical needs where he

had "recei[ved] [] two letters from [the plaintiff]," even though the defendant then "promptly referred" those letters to "other individuals for investigation and response." Id. By contrast, the record here does not demonstrate that Dr. Gusman even took steps of referral to others—only that, like the defendant in Goris, he received emails sent by Dr. Andola, Dr. Mueller, and Dr. Dinello. Without more in the record demonstrating what actions Dr. Gusman took or what omissions he made after receiving those emails, the evidence of mere receipt cannot substantiate his personal involvement. See Goris, 402 F. App'x at 584; Sealey, 116 F.3d at 51. Therefore, just as the allegation that Dr. Gusman received emails containing information related to Dr. Andola's MWAP Request is insufficient to establish personal involvement, the evidentiary record of his receipt of those emails is insufficient, too.

However, Plaintiff's deposition testimony creates a question of fact regarding Dr. Gusman's personal involvement in the denial of adequate medical care. Plaintiff testified that, after his Neurontin prescription was discontinued, he told Dr. Gusman that he was in pain, that he felt Neurontin had previously treated his pain effectively, and that none of the medications he was taking as alternatives to Neurontin were treating his pain effectively. (See Agnew Decl. Ex. 25 at 209:14-210:11.) Although Plaintiff did not testify that he specifically asked Dr. Gusman to re-prescribe

43

Neurontin after its discontinuation or to submit a new MWAP Request for Neurontin, his testimony reveals that he made Dr. Gusman aware of the pain he suffered following the discontinuation of his Neurontin prescription and the ineffectiveness of the medications that replaced Neurontin.  For certain, Plaintiff's testimony about the information he gave Dr. Gusman is vague—he did not indicate in his deposition when this interaction with Dr. Gusman occurred or what Plaintiff hoped Dr. Gusman might do to remedy his pain. However, at this stage, the Court must construe the record—including Plaintiff's testimony—in the light most favorable to Plaintiff and "must resolve all ambiguities and draw all reasonable inferences against the movant."  Brod, 653 F.3d at 164 (internal quotations and citations omitted).

Thus, although Plaintiff's testimony presents a very close factual question, it creates sufficient ambiguity to prevent the Court from granting the Non-State Represented Defendants' motion on the basis that Dr. Gusman was not personally involved.  Because the record is ambiguous as to what Dr. Gusman knew about the extent of Plaintiff's pain, when he knew it, and what, if anything, Plaintiff asked Dr. Gusman to do about it, the Court cannot say, as a matter of law, that no reasonable jury could conclude Dr. Gusman was personally involved in the denial of adequate medical care for Plaintiff.

The lack of clarity regarding Dr. Gusman's knowledge of Plaintiff's pain and treatment following the discontinuation of Plaintiff's Neurontin prescription also requires the Court to deny the Non-State Represented Defendants' motion on their alternative ground that Dr. Gusman was not deliberately indifferent to Plaintiff's medical needs. (See NSRD Br. at 12 n.1.) Plaintiff's testimony that he told Dr. Gusman about the pain he was in and did not believe the replacement medications adequately treated the pain creates a question of fact about when Dr. Gusman learned of Plaintiff's pain, what he knew about the inadequacy of the alternative treatment, and the extent of his knowledge. It also creates a question of fact about whether Dr. Gusman took any action in response to what Plaintiff told him or whether he instead disregarded the risk that Plaintiff would continue to suffer unnecessary pain without new, adequate medications or treatment. Accordingly, the Court cannot grant summary judgment for Dr. Gusman. See Brock, 315 F.3d at 164; Liberty Lobby, Inc., 477 U.S. at 248.

Dr. Dinello, on the other hand, cannot be liable for any deprivation of medical care resulting from the denial of the October 4, 2018, MWAP Request for Lyrica. The parties do not dispute that he played no part in Dr. Mueller's denial of Dr. Andola's request. Therefore, Dr. Dinello was not sufficiently

involved in the denial to incur liability for the denial of that request.  See Iqbal, 556 U.S. at 676; Black, 76 F.3d at 74.

### C. Qualified Immunity

Plaintiff asserts that the clearly established right each of the Defendants should have known he or she was violating was Plaintiff's right to be free from prison officials' "deliberate[] indifferen[ce] to an inmate's serious medical needs." (See Pl. Opp. at 58.)  The State Represented Defendants argue the right was narrower—namely, that the right violated was the "den[ial] [of] long-term prescriptions of medications that have addictive qualities and potentially serious side-effects in favor of safer treatment strategies." (SRD Br. at 23.)  The Non-State Represented Defendants do not explicitly articulate what right was or was not clearly established, instead arguing that Dr. Andola's "particularized interaction" with Plaintiff and the "myriad of unique facts regarding [her] individual treatment decisions" make it impossible to fit her actions into any clearly established right, thereby entitling her to qualified immunity.  (See NSRD Br. at 19-20.)

At a minimum, Plaintiff has a "right to be free from deliberate indifference to serious medical needs." See LaBounty, 137 F.3d at 74 (rejecting Defendants' narrower view that the right at issue in the plaintiff's Eighth Amendment claim was a "right to be free from crumbling asbestos").  However, because Court of

46

Appeals precedent demands defining the "clearly established right" with specificity as to the particular conduct, see Vega, 963 F.3d at 275, the Court finds that a narrower definition of Plaintiff's right at issue is required.

      1.  The SRDs' Qualified Immunity Defense

In Griffin v. Amatucci, an inmate at Upstate Correctional Facility alleged that a doctor and a nurse at the facility had violated the Eighth Amendment "by refusing to provide him with a treating-physician recommended humidifier for his . . . [CPAP] machine pursuant to a policy of not providing humidifiers." 611 F. App'x at 734. The Court of Appeals relied on Johnson v. Wright and Brock v. Wright to conclude that the "clearly established right" at issue was a right to be free from a "reflexive application of [a] . . . policy in the face of a contrary recommendation by [plaintiff's] treating physician[.]" Id. at 735. Given the similarities between the allegations in Griffin and the ones Plaintiff has put forth in the instant case, the Court finds the Court of Appeals' reasoning persuasive.

Johnson, on which the Court of Appeals relied in Griffin, is even more on point to the facts of the instant case and provides what this Court finds is the appropriately tailored right in the assessment of the State Represented Defendants' qualified immunity defense. In Johnson, the plaintiff claimed New York State corrections officials were deliberately indifferent to his serious

47

medical needs because the officials had denied a request from the plaintiff's treating physician to prescribe the plaintiff a particular medication to treat his Hepatitis C.  See Johnson v. Wright, 412 F.3d 398, 400-02 (2d Cir. 2005).  The officials had denied the physician's request because a department policy in effect at the time permitted the officials to deny such treatment if an inmate had a recent history of substance abuse, which the plaintiff did.  See id. at 401.

In its review of the plaintiff's argument that the officials had violated the Eighth Amendment, the Court of Appeals framed the question in the case as whether "the application of the policy" of denying Hepatitis C medications to inmates with a history of substance abuse "in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." Id. at 404.  In vacating the district court's decision granting summary judgment to the defendant corrections officials on this question, the Court of Appeals held that a jury could find that "the defendants acted with deliberate indifference by reflexively relying on the medical soundness of the . . . substance abuse policy when they had been put on notice that the medically appropriate decision could be, instead, to depart from the [policy] and prescribe" the medication the inmate's treating physician recommended.  Id. at 406.  The Court of Appeals articulated a similar question of deliberate indifference two years prior in

48

Brock:   "whether   following   [a]   policy"   forbidding   certain
treatments absent particular symptoms resulted in unconstitutional
deliberate indifference to the plaintiff's medical needs.   See
Brock, 315 F.3d at 162, 166.

The Court finds that the Eighth Amendment right the Court of
Appeals articulated in Johnson—the right to be free from reflexive
application of a policy denying a medication to any inmate with
substance abuse risk—provides the clearly established right to
analyze the State Represented Defendants' qualified immunity
argument given the degree of similarity to the allegations
Plaintiff has put forth.  The Court also concludes that the right
defined in Johnson is defined specifically enough to render it
clearly established in the context of Eighth Amendment claims.
See Collymore, 74 F.4th at 30; Vega, 963 F.3d at 275.

As in Johnson and Brock, the instant case involves (1) a
treating physician's request to implement a particular treatment,
(2) senior corrections officials' rejection of that request,
(3) due to a policy favoring such rejection.  And, as in Johnson
specifically, the treating physician here sought to prescribe a
medication that the officials rejected because the policy in
question favored such rejections due to the risk of substance
abuse.  In both cases, the Court of Appeals held that granting
summary judgment for the prison officials was inappropriate
because a jury could conclude, based on the evidence, that the

49

prison officials' deference to policy constituted deliberate
indifference because it was made without sufficient consideration
of the inmate's medical needs or of the treating physician's
recommendation.  See Johnson, 412 F.3d at 404-06; Brock, 315
F.3d at 167.

Therefore, the Court finds that the Court of Appeals has
spoken sufficiently clearly in holding that inmates have an Eighth
Amendment right not to have prison officials rely on a policy to
reject a request for a medication when the officials know it might
be medically appropriate to prescribe the medication instead.
Because the Court of Appeals ruled on this right nearly two decades
ago, and later reiterated the right in Griffin, it should have
been "clear to a reasonable officer" that the denial of
Dr. Andola's request to treat Plaintiff with Neurontin was
unlawful.  See Ziglar, 582 U.S. at 152.  Accordingly, Plaintiff's
right was clearly established and not subject to the State
Represented Defendants' qualified immunity defense.  See id.

2.  The NSRDs' Qualified Immunity Defense

The Non-State Represented Defendants argue that the facts of
the instant case are too unique for there to have been a clearly
established right Dr. Andola knowingly violated and that
Dr. Andola acted in an objectively reasonable manner after the
RMDs rejected her MWAP Requests.  (See NSRD Br. at 18-20.)

50

The Non-State Represented Defendants are correct that Dr. Andola would be entitled to immunity "if either (a) [her] action[s] did not violate clearly established law, or (b) it was objectively reasonable for [her] to believe that [her] action did not violate such law." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001) (internal quotations and citations omitted). The Court finds that the particular right clearly established by law as applicable to Dr. Andola—as distinct from Plaintiff's clearly established right to be free from the RMDs' reflexive application of a policy in determining his medical treatment—is the right to be free from a physician's deliberate indifference to his medical needs through "consciously choos[ing] an easier and less efficacious treatment plan." Chance, 143 F.3d at 703 (internal quotations and citations omitted). The Court of Appeals not only articulated this right in Chance v. Armstrong but reaffirmed in Brock that it is a right protected by the Eighth Amendment. See Brock, 315 F.3d at 167.

As the Court described in detail above, there remain genuine issues of material fact about whether Dr. Andola's course of treatment following the RMDs' denials constituted knowing and deliberate indifference to Plaintiff's medical needs, including whether she consciously chose an easier, less efficacious treatment plan than was warranted. See Chance, 143 F.3d at 703.

Thus, at this stage, the Court cannot conclude as a matter of law that she did not violate a clearly established right.

Because of those same disputed facts, the Court cannot find that Dr. Andola is entitled to qualified immunity on the basis of her objective reasonableness. "[W]here . . . the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied." Knight v. N.Y. State Dep't of Corrs., 2022 WL 1004186, at *18 (S.D.N.Y. Mar. 30, 2022) (internal quotations and citations omitted). This is because the question of reasonableness in a physician's treatment of a prisoner is "not whether [the physician's] actions were objectively reasonable based on [the physician's] own version of his [or her] actions," but on whether the physician's actions "were objectively reasonable based on the record viewed in the light most favorable to [the plaintiff] and with all inferences drawn in [the plaintiff's] favor." Warren v. Chakravorty, 2006 WL 2067736, at *8 (S.D.N.Y. July 25, 2006) (denying summary judgment based on a qualified immunity defense). Taking the record in the light most favorable to Plaintiff, as the Court must on the Non-State Represented Defendants' motion, the Court concludes that a reasonable jury could conclude that Dr. Andola's chosen course of treatment was not objectively reasonable given her apparent lack of effort to pursue alternative routes to get approval for her MWAP Requests or to obtain

prescriptions for Plaintiff's pain other than those Plaintiff
specifically requested.  Accordingly, Dr. Andola is not entitled
to summary judgment on the basis of qualified immunity.

For the very same reasons, the Court cannot grant the Non-
State Represented Defendants' motion with respect to Dr. Gusman on
the basis of qualified immunity.  As described in detail above,
the record contains a genuine dispute of material fact about
whether Dr. Gusman knew of and disregarded the risks to Plaintiff's
health after Plaintiff informed him of the pain he was suffering
and the ineffectiveness of the alternative treatments he had been
given.  As is the case with Dr. Andola, this factual dispute raises
a question for the jury about whether Dr. Gusman chose or
maintained an easier and less efficacious treatment for Plaintiff
after he learned of Plaintiff's pain and the ineffectiveness of
the medications that replaced his Neurontin prescription.  The
same factual dispute would also permit a reasonable jury to
conclude that Dr. Gusman's response—or lack thereof—to what
Plaintiff told him about his pain and treatment was not objectively
reasonable.  Therefore, because the Non-State Represented
Defendants failed to show that Dr. Gusman's actions did not violate
clearly established law or were objectively reasonable, the Court
cannot dismiss him on the basis of qualified immunity at this
stage.  See Newburgh Enlarged Sch. Dist., 289 F.3d at 250; Knight,
2022 WL 1004186, at *18; Chance, 143 F.3d at 703.

### D. Exhaustion of Remedies

Because the Court has granted the State Represented Defendants' motion with respect to the denial of Dr. Andola's October 4, 2018, MWAP Request for Lyrica, the Court need not rule on their argument that Plaintiff failed to exhaust his administrative remedies following that denial. (See SRD Br. at 24-25.)

## V.   Conclusion

For the reasons set forth above, the State Represented Defendants' motion is granted in part and denied in part. The motion is DENIED with respect to the June 9, 2017, MWAP Request for Neurontin but GRANTED with respect to the October 4, 2018, MWAP Request for Lyrica.

The Non-State Represented Defendants' motion is DENIED in its entirety.

Trial in the above-captioned case is scheduled for October 28, 2024, at 10:00 a.m. The parties shall submit a proposed schedule for filing a joint pretrial order, motions in limine, oppositions to motions in limine, joint proposed jury instructions, and proposed voir dire questions no later than July 12, 2024.

The Clerk of the Court shall close docket entry numbers 17, 22, and 26.

**SO ORDERED.**

Dated:     June 21, 2024
           New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge